UNITED STATES (AMERICAN SPONGE & CHAMOIS CO., INC., PARTY IN INTEREST) v. NYLONGE CORPORATION (No. 5034)[1]

[1] C.A.D. 764.

United States Court of Customs and Patent Appeals, Nov. 17, 1960

*Sharretts, Paley & Carter* (*Howard Clare Carter* and *W. R. Johnson*, of counsel) for appellant.
*Ulmer, Berne, Laronge, Glickman & Curtis* (*Sheldon J. Gitelman*, of counsel) for appellee.

Before WORLEY, Chief Judge, and RICH, MARTIN, and SMITH, Associate Judges, and Judge WILLIAM H. KIRKPATRICK.[2]

MARTIN, Judge, delivered the opinion of the court:

 This is an appeal by American Sponge & Chamois Co., Inc., importer, herein called "the party in interest," from a judgment of the United States Customs Court, First Division, C.D. 2144, sustaining the protests filed by an American manufacturer, Nylonge Corporation, under section 516(b) of the Tariff Act of 1930, as amended (19 U.S.C. 1516(b)). The imported merchandise was classified by the collector as compounds of cellulose, in blocks, sheets, or other forms, not made into finished or partly finished articles, under the provisions of paragraph 31(b)(1) of the Tariff Act of 1930. The importer, the party in interest, urges that this classification is correct.

The American manufacturer, appellee here, protested and the Customs Court agreed that the merchandise should be classified as compounds of cellulose made into finished or partly finished sponges under paragraph 31(b)(2) of the Tariff Act of 1930.

Paragraph 31(b)(1) and paragraph 31(b)(2), Tariff Act of 1930, as modified respectively by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, supplemented by T.D. 52763, and by T.D. 54108, read in pertinent part as follows:

---

[2] United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate *in place of Judge O'Connell*, pursuant to provisions of section 294(d), Title 28, United States Code.

31(b) All compounds of cellulose (except cellulose acetate, but including pyroxylin and other cellulose esters and ethers), and all compounds, combinations, or mixtures of which any such compound is the component material of chief value:

 (1) In blocks, sheets, rods, tubes, powder, flakes, briquets, or other forms, whether or not colloided, not made into finished or partly finished articles:

\* \* \* \* \* \* \*

 Other _____ 20¢ per lb.

 (2) Made into finished or partly finished articles of which any of the materials provided for in paragraph 31(b)(1), Tariff Act of 1930, is the component material of chief value not specially provided for \* \* \*:

 Sponges _____ 40½% ad val.

The parties appear to be in complete agreement that the merchandise in controversy is a compound of non-acetate cellulose. Samples of the imports are in evidence as Exhibits 8 and 9, and are described by the Customs Court as follows:

One is rectangular in shape, measuring about 31 inches in length, 4 inches wide, and 2½ inches thick \* \* \*. The other is oval, measuring about 5¼ inches in greater and 3¾ inches in lesser diameter, and 32 inches long \* \* \*.

Examination of another sample which had been cut shows that the blocks are largely sponge-like in texture with a relatively thin smooth outer skin or rind. The merchandise has been referred to frequently in the testimony as "cellulose sponge."

The parties have stipulated certain steps as typical of those taken in the preparation of a cellulose sponge. Of these, only the last group is now of significance. These last steps relate to treatment of sponge blocks after removal from coagulation molds:

I. After Treatment of Sponges:
 (a) Further washing to remove any remaining salt.
 (b) Bleaching.
 (c) Washing to remove the bleaching agent.
 (d) Acid treatment to remove [sic] the pH.
 (e) Washing to remove any excess acid.
 (f) Addition of a plasticizer or softening agent, which also contains a fungicide.

There appears to be some controversy as to the precise stage of manufacture that the merchandise at bar has reached when it is imported. In this regard, the following uncontroverted testimony relative to the imports by a witness on behalf of the party in interest is instructive:

We take these blocks, and the first thing we do is to steep them in a chemical bath. The chemical bath we use contains four separate chemicals. Two of these chemicals are for the purpose of plasticizing or softening the blocks. One

of the chemicals is for the purpose of maintaining the pH or correct acidity of the blocks, and the last chemical is for the purpose of acting as a mold inhibitor to inhibit the growth of mold in the sponges. * * *

We agree with the Customs Court that the merchandise at bar has passed step I(c) but not step I(d) at the time it is imported into the United States.

Before and during the trial of this case in the Customs Court, the party in interest moved to dismiss the protests of the American manufacturer on jurisdictional grounds. These motions were denied. Error is assigned as to these denials and they have been argued before us. The issues relate to compliance by the American manufacturer with the provisions of section 516(b) of the Tariff Act of 1930, as amended (19 U.S.C. 1516(b)). The pertinent portions thereof are:

> If such manufacturer, producer, or wholesaler believes that the proper rate of duty is not being assessed, he may file a complaint with the Secretary, setting forth a description of the merchandise, the classification, and the rate or rates of duty he believes proper, and the reasons for his belief. * * *
>
> * * * * * * *
>
> The Secretary shall direct the collector at such port to notify such complainant immediately when the first of such entries is liquidated. Within thirty days after the date of mailing to the complainant of notice of such liquidation, the complainant may file with the collector at such port a protest in writing setting forth a description of the merchandise and the classification and rate of duty he believes proper. * * *

In an apparent attempt to comply with these provisions, appellee had filed a complaint with the Secretary of the Treasury, 93 Treas. Dec. 70, T.D. 54537, relating to classification of the imported merchandise. This complaint includes a description of the merchandise involved and a statement that the merchandise has the same chemical origin and basically the same composition as the complainant's product. The preparation of the latter product also recited therein is substantially the same as that stipulated by the parties here as typical in the preparation of cellulose sponges, including steps (d), (e), and (f) of "I. After Treatment of Sponges" (supra). The Secretary affirmed the collector's classification of the imports. Thereafter, four entries of the merchandise were made on four different dates. These four entries were later all liquidated on the same date. It appears that appellee was notified of the four simultaneous liquidations and that it filed four corresponding protests with the collector.

The party in interest contended that according to section 516(b), the Customs Court has no jurisdiction to consider any protest other than that directed to the first entry liquidated and that no particular entry of the four has been shown to be the first liquidated. The Customs Court rejected this contention, stating that appellee did protest the first liquidation of which it was notified.

The party in interest also contended that the merchandise covered by the protests differs in important respects from the merchandise described in the complaint to the Secretary in that the merchandise at bar, in its imported condition, has not been subjected to an acid treatment and has not been plasticized. The Customs Court regarded this contention as without merit, stating:

> Whatever variance there may be between the identification of the merchandise in these protests and the description given in the complaint to the Secretary of the Treasury, it did not mislead or affect the conduct or the procedure followed by the party in interest in the course of the trial, * * *.

The party in interest now appears to urge that the court below misinterpreted its position which is as follows:

> * * * The Commissioner of Customs, to whom authority was delegated by the Secretary of the Treasury, never had an opportunity of passing upon the American manufacturer's claim with respect to the merchandise here before the Court so that there cannot be a valid appeal from a decision that was never rendered. The Commissioner rejected the appellee's claim on merchandise that had been further processed than that at bar. Therefore, none of the protests is authorized by section 516(b) and all of them should be dismissed.

We are of the opinion that the Customs Court was correct in denying the motion to dismiss. Neither basis for the motion is meritorious. The provisions of section 516(b) provide an orderly and expeditious procedure whereby an American manufacturer, producer, or wholesaler can protest the classification of imported merchandise. With regard to the four entries, both the complainant and the collector have fulfilled all the requirements of the statute. All entries pertained to like merchandise and the collector followed the statutory procedure in notifying the complainant of the liquidations. The complainant duly protested each liquidation. ▮ Certainly it was not the intent of Congress to provide an importer with a procedural device by which he could nullify these proceedings as would be the case if the contention of the party in interest prevailed in this instance. The complainant should not be thwarted in its attempt to have the classification of this merchandise adjudicated merely because four entries of different date were liquidated on the same date. Liquidation date was a matter beyond control of the complainant.

As to the nature of the complaint to the Secretary, here also it appears to us that the complainant has complied fully with the requirements of the statute. That the complaint merely includes certain processes which are not necessary to the actual production of the cellulose sponge material and to which the imports had not been subjected before importation is not persuasive that the imported merchandise is different from that designated in the complaint. There is no question but that the imported merchandise was ade-

quately identified and is *basically* the same as that of the complaint. Moreover, there is no evidence that the Secretary of the Treasury made a decision on goods of a different description than that of the imported goods.

We come now to the merits of this controversy, the classification of the imported merchandise. The Customs Court summarized as follows the testimony of a witness on behalf of the party in interest relating to the processes followed in making the imported sponge blocks available as commercially marketable commodities:

> The imported sponge blocks are steeped in a chemical bath, containing four separate chemicals. Two of the chemicals are softening agents; another is for the purpose of maintaining the correct acidity of the blocks; and the fourth chemical acts as a mold inhibitor. Then, the blocks are put into specially designed squeeze rollers that adjust the products to proper moisture content. While the blocks are still wet, they are put through specially designed cutting equipment which, in one cutting operation, slices the blocks into desired smaller sizes. The blocks are not dedicated to any particular thickness or any specific number of individual sponges. They are cut into many different sizes and unusual shapes. After the cutting operation, the individual sponges are placed on a conveyor belt that moves them to "an assembly line of girls who insert them individually into polyethylene bags," that have "a moisture retention value," and which, with the softening agent, prevent the sponges from drying out in the package while they are on shelves awaiting purchase by a customer. All of the processing after importation improves the appearance, rather than the utility, of the sponges and promotes their commercial salability.

The Customs Court then made the following findings:

> The handling of these sponge blocks, after importation, added nothing to the merchandise as cellulose sponges. The softening agent serves to retain moisture content and also facilitates slicing the blocks into desirable sizes. Its presence is merely temporary, as it washes out within a few minutes after the sponge had been used. Furthermore, it is used only where appearance is a consideration in merchandising the sponges. Cutting the imported sponge blocks is limited to the desired thickness. The cutting process does not affect, in any way, the important properties, of absorption and texture, of the sponges. Finally, the packaging of the sponges in plastic bags is to attract prospective purchasers. The sole purpose of the manipulations of the sponge blocks after importation is to promote the marketability of the products.

Accordingly, the Customs Court affirmed the protest of the appellee and classified the merchandise as compounds of cellulose, made into finished or partly finished sponges, within the meaning of paragraph 31(b)(2), Tariff Act of 1930, as amended.

The party in interest appears to urge that the merchandise in controversy in its imported condition is a manufactured cellulose sponge material and that the material is not ready for any final use or dedicated to making any particular article or class of articles. The party in interest stated:

\* \* \* We urge that the facts presented as to the nature of the material involved and the degree of processing to which it was subjected prior to importation compel the conclusion that the blocks at bar are not made into finished or partly finished articles. We have shown that these blocks have not been advanced beyond the process necessary to create the compound of cellulose in a form specified in paragraph 31(b)(1).

We urge that the imported sponge blocks are no more finished or partly finished into articles than are bars of steel since both are suitable for use and are used for the production of a variety of articles. \* \* \*

Appellee, on the other hand, urges that the steps taken after importation of the sponge block or loaf including such operations as addition of a softening agent and slicing are not essential and promote only the attractiveness and marketability of the merchandise and not its utility. Appellee also stated:

\* \* \* Customarily an item which is a cellulose compound is usable only as a component part of some other article or by giving it a particular shape. It must be molded, attached to some other article, or have some article attached to it in order to give it utility. The cellulose sponge, however, derives its utility from its own peculiar attribute—the capacity to absorb. Thus, unlike most other cellulose products, the cellulose sponge carries with it its own utility. It is completely useful as a sponge whenever it acquires its ability to absorb. Under these circumstances it could, for example, become a compound of cellulose and partly finished at the same instant.

It is apparent from the cases cited by both parties that ▪ the question whether imported merchandise is merely a material or is a finished or partly finished article has been before this court and our predecessor court on numerous occasions. Because of differences in the factual situations in each case, the results vary greatly. However, we believe the status of the law in this connection is most concisely stated in *J. B. Henriques, Inc.* v. *United States*, 46 CCPA 54, C.A.D. 695, which involved the identical paragraphs here in issue. This court said:

It is not possible from the authorities such as we have hereinbefore enumerated to formulate any general principle which can be universally applied. The decisions appear to have been made on the basis of an appraisal of the particular facts of the respective cases. They were obviously rendered in the light of such considerations, for example, as the extent of the changes made in the raw material; the amount of the work remaining to be done before a finished article can be produced; the similarity between the article as imported and the final product; and whether the work on the imported merchandise was done primarily to facilitate the shipping thereof or to advance the article toward completion.

There is no significant disagreement concerning the facts here. Both parties agree that the importations are cellulose sponge material. The question is whether this material before importation was advanced to such an extent that it could be considered a partly finished article. At the outset, we may say that the importations were obvi-

ously formed in the rectangular and oval shapes having specified dimensions for a definite reason. That reason is evident from the testimony given in behalf of the party in interest (appellant). The witness stated:[3]

Q. What percentage of sponges cut from blocks like Exhibits 8 or 9 [samples of imported merchandise] are packaged like Exhibits 11 or B? A. Well, I don't know the exact percent, but by far the overwhelming, I would say well over 90 to 95 per cent.

Aside from the chemical treatment of the importations after arrival in the United States, which will be discussed later, the only process to which the importations are subjected is a slicing of the cellulose sponge loaves into pads of varying thicknesses. In some instances the importations are sold without any further processing. This same witness testified to this effect as follows:

Chief Judge Oliver: Did you ever sell Exhibits 8 and 9 as they are now, as imported?

The Witness: We have on occasion, but usually we give them instructions on how to cut them in use. Nobody is ever able to use the block in the imported condition. I never in all my experience knew anybody to use it in this form.

Chief Judge Oliver: Have you ever seen this used as sponges without any further treatment?

The Witness: Yes, it could be done. Plasticizing is done by every domestic manufacturer, including the plaintiff.

The chemical treatment of the merchandise after importation is without significance in resolving the issues here. The treatment serves only to keep the material soft and free from mold. This affects only the salability of the product. As a matter of fact, these chemicals wash out after the sponges are used. The utility of the product is in the absorption ability which exists in the imported goods. Furthermore, the evidence indicates that some purchasers, such as the Government, buy the imported goods sliced into varying thicknesses without requiring that the goods be chemically treated after importation.

Appellant contends that since the imported sponge material is used to make many items other than the controversial sponge pads sliced from the cellulose sponge loaves, there is not sufficient dedication to any one use to classify the importations as finished or partly finished sponges. We do not agree with appellant's position because, in addition to the testimony that 90–95% of the imported merchandise is used to make sponges of varying thicknesses, the evidence indicates that these other items are made from sponge material other than

---

[3] Exhibits 11 and B have either the oval or the rectangular shape of the imports, Exhibits 8 and 9, and presumably were obtained by slicing from these imported loaves. It was explained that the overall dimensions of the sliced pads differ somewhat from the overall dimensions of the imported loaves because of the chemical treatment after importation.

the imported cellulose sponge loaves at bar. The witness for the party in interest testified with regard to this as follows: [4]

X Q. With respect to party in interest's Illustrative Exhibits C through K, would it be commercially feasible to make all of these items from items such as Plaintiff's Exhibits 8 and 9?

Judge Wilson: Without further processing Exhibits 8 and 9; as they are there?

Mr. Gitelman: Yes.

The Witness: I think your question means, do either of these particular blocks lend themselves to every particular item on the table; commercially feasible?

Mr. Gitelman: Yes.

The Witness: I would say, no. We have special blocks for special manufacturers.

Under these circumstances, it is our opinion that the imported cellulose sponge loaves are sufficiently advanced toward the completion of the finished product to be considered dedicated to their ultimate use. Therefore, it is concluded that the imports are partly finished sponges and are properly classifiable under paragraph 31(b)(2) of the Tariff Act of 1930.

Although we have considered the various authorities cited by the appellant, we see no purpose in reviewing them here, since the facts in each of those cases were determinative of the conclusions reached. On the facts before us, we have concluded that the importations are partly finished sponges. For the foregoing reasons, we *affirm* the judgment of the Customs Court insofar as it relates to the classification of the importations, but ▬ we do not decide the question of the reliquidation since this matter was not assigned as error under the rules of this court.

[4] Exhibit C—paint roller; Collective Exhibit D—floor mop with a molded top, dish mop with a plastic handle; Exhibit E—inner soles; Exhibit F—sweat band; Exhibit G—wash cloth of cellulose sponge and terry cloth; Exhibit H—scouring pad; Exhibit I—part of starch electrophoresis apparatus; Exhibit J—hat band; Exhibit K—combination cellulose and polyurethane sponge. Exhibits I, J, and K were presented as catalog pages rather than as the actual articles.
[1] C.A.D. 765.